UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 06-187-KSF

WILLIAM SANFORD PLAINTIFF

v. **OPINION & ORDER**

MAIN STREET BAPTIST CHURCH
MANOR, INC. and SOUTHEASTERN
MANAGEMENT CENTER, INC. DEFENDANTS

* * * * * * * * * * *

This matter is before the Court upon the motion of the defendants, Main Street Baptist Church Manor, Inc. and Southeastern Management Center, Inc., for summary judgment against the plaintiff, William Sanford. [DE #27] This matter has been fully briefed and is ripe for review.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

This lawsuit arises from the alleged sexual harassment of the plaintiff, William Sanford, by his supervisor, Marla Carter, while he was employed by Main Street Baptist Church Manor, Inc. ("the Manor"). As a result of this alleged harassment, Sanford sued the Manor and Southeastern Management Center, Inc. ("Southeastern"), the management company for the Manor, for sexual harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"). Sanford also asserts state law claims against these defendants for unlawful employment practices under KRS 344.040.

In support of his claims, Sanford makes the following factual allegations. Sanford began

working at the Manor as a part-time summer maintenance worker in 1999. In August 2000, Sanford assumed a full-time maintenance position at the Manor and also provided courtesy (or security) services. Sanford was hired based on the recommendation of his stepfather, Greg Bolton, who was the Manor's property manager at the time. Sanford performed both maintenance and courtesy services for the Manor. Because the Manor is a designated Section 8 housing facility which receives federal financial assistance from the Department of Housing and Urban Development ("HUD"), it is required by law to comply with HUD regulations and is subject to HUD inspections. As a result of an October 2003 HUD inspection of the Manor, Sanford's work performance came under scrutiny.

In January 2004, Marla Carter was hired to replace Bolton as property manager of the Manor. In February 2004, Carter prepared several memoranda which requested that Sanford: (1) perform some maintenance; (2) move his car; (3) alter his work schedule (and informed him of the Manor's overtime policy); and (4) provide Carter with access to all property keys. According to Sanford, the memos were simple written requests, although the defendants contend that the memos constitute write-ups for misbehavior and insubordination.

Sanford alleges that in March 2004, Carter began to flirt with him. According to Sanford, the flirtation escalated over time and continued through April 2004. On one occasion, Carter asked to smell Sanford's cologne, and instead kissed him on the neck. On another occasion, Carter pinched Sanford on his bottom. She also tapped him on the bottom between 15 and 20 times. Carter made repeated sexual innuendos and suggestive statements towards Sanford, including describing her sexual abilities. Carter suggested they go out of town together, offered to purchase him a new suit, and ensured him that she would see that his shift at the Manor was covered. Carter showed up uninvited at his Manor apartment at night on several occasions to check on him and bring him food.

On one occasion in April 2004, Sanford did volunteer to drive Carter to her uncle's funeral on the assumption that his mother would also ride along with them. However, Sanford's mother was unable to go, and during the ride Sanford alleges that Carter engaged in sexual conversation and groped him in the groin. As a result, Sanford arranged for Carter to ride home with someone else.

As a result of Carter's alleged harassment, Sanford contends that he attempted to avoid Carter which inevitably disrupted his work progress. At some point after the trip to the funeral, Sanford orally reported the alleged harassment to Jean Peyton, Southeastern's director of retirement housing, who allegedly took no action. In June or July 2004, Sanford orally reported the alleged harassment to Elder Cornelius, who instructed him to contact Elder Ward. Both Elder Cornelius and Elder Ward are members of the Manor's board of directors. When he contacted Elder Ward, Sanford was instructed to report to Elder Ward's home, where he orally repeated his claims of sexual harassment, yet he contends that no action was taken.

After making these oral reports of sexual harassment, Sanford claims that his job at the Manor took a downward spiral. He cites the following events as evidence of the defendants' retaliation. First, Sanford claims that Carter began to write him up, accusing him of laziness, not doing his work, and of being vulgar and verbally abusive to the residents. Second, Sanford points to the timing and outcome of his August 2004 job evaluation as evidence of retaliation. Sanford claims that although the evaluation was to be completed by August 1, 2004, Carter did not complete the evaluation until August 9, 2004. He also complains that he received a score of only 66 (a score of 80-95 was required for the full 5.5% pay raise), and although the evaluation recommended a pay raise, Sanford contends that he did not receive a pay raise. Third, Sanford claims that Carter and Peyton recommended to the Manor's board that he be placed on probation or terminated. Fourth,

Sanford claims that in October 2004, Carter and Peyton accused him of stealing a resident's pills to a police officer investigating the theft of medication from a resident. Fifth, Sanford contends that the defendants removed his pager and forced him to move out of his apartment in two weeks instead of four. Sixth, Sanford was also informed that his courtesy services would no longer be needed. Because Sanford depended upon both his maintenance and courtesy paycheck, he resigned from his position at the Manor in March 2005 because he could no longer sustain himself on his maintenance paycheck alone. Finally, Sanford claims that despite assuring him that his unemployment would not be contested when he applied for unemployment benefits, the defendants challenged his application.

The defendants have moved the court for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.[1] In support of their motion, the defendants make the following arguments: (1) Sanford has failed to present a prima facie case of retaliation and has failed to establish that the alleged acts of retaliation are not a legitimate non-retaliatory business action and/or decision; (2) Sanford has failed to present an actionable claim of hostile work environment or *quid pro quo* sexual harassment; and (3) the defendants are entitled to the *Faragher* affirmative defense.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." In essence, "Rule 56(c) mandates the entry of summary judgment, after adequate time for

---

[1]Currently pending before the Court is the defendants' motion for reconsideration [DE #37] of the Court's May 30, 2007 Opinion & Order granting Sanford's motion for a ruling that Southeastern is a joint employer. In light of this Court's ruling set forth below, the motion for reconsideration will be denied as moot.

discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must view the evidence in a light most favorable to the nonmovant, as well as draw all reasonable inferences in the nonmovant's favor. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984). The court, however, must not judge the evidence or make findings of fact. *60 Ivy Street Corporation v. Alexander*, 822 F.2d 1432, 1436 (6th Cir. 1987). The moving party bears the burden of demonstrating the absence of all genuine issues of material fact, and this burden may be discharged by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325. Once the moving party discharges the burden, it then shifts to the nonmoving party to present specific facts showing a genuine triable issue. Fed. R. Civ. P. 56(e).

## III. ANALYSIS

Sanford asserts federal and state law claims of sexual harassment under two distinct theories: hostile work environment and *quid pro quo*. He also asserts a claim of retaliation resulting from his reporting of the alleged sexual harassment. Sanford's claims under the Kentucky Civil Rights Act and Title VII are analyzed in the same manner. *Clark v. United Parcel Service, Inc.*, 400 F.3d 341,347 (6th Cir. 2005).

### A. HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT

Sanford first alleges that Carter's conduct created a hostile work environment in violation of Title VII and KRS 344.010 *et seq*. To establish a prima facie case of sexual harassment based on a hostile work environment, a plaintiff must show that:

(1) he is a member of a protected class; (2) he was subjected to unwelcomed sexual

> harassment; (3) the harassment was based on his sex; (4) the harassment created a hostile work environment; and (5) the employer is vicariously liable.

*Clark*, 400 F.3d at 347; *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462-63 (6th Cir. 2000). The defendants do not dispute that Sanford has satisfied the first three requirements of a hostile work environment claim.

Thus, the Court must determine whether Sanford has established that Carter's conduct created a hostile work environment such that the defendants should be held vicariously liable. The Supreme Court has held that "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations omitted) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986)). Whether or not a hostile work environment exists is "judged by both an objective and a subjective standard: The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997).

"Rather than considering each event complained of in isolation, [the court] must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive." *Randolph v. Ohio Dept. of Youth Services*, 453 F.3d 724 (6th Cir. 2006). Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Sanford's allegations of sexual harassment are not simply isolated incidents of sexual banter, but rather frequent and recurring physical touching and offensive sexual speech over a period of at least two months. Clearly, from an objective standpoint, Sanford has established that Carter created a hostile work environment. Moreover, although Sanford has testified that not all of Carter's alleged harassment was offensive, he has also testified that her advances resulted in his avoidance of Carter and impacted his ability to accomplish his work. While the initial incidents of sexual harassment alone may not have "offended" Sanford, the cumulative effect of the sexual touching and sexual speech clearly troubled and disturbed Sanford to the point of avoiding Carter and complaining to management. Thus, Sanford has met both the objective and subjective component of this element of a hostile work environment claim.

The Court now must turn to the final element of a hostile work environment claim - whether the employer should be vicariously liable. Courts apply slightly different standards depending upon whether the alleged harasser is a co-worker or a supervisor of the victim. If the alleged hostile work environment is a result of the victim's co-worker, an employer is liable only "if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999) (internal quotation marks omitted). However, if the alleged hostile work environment is the result of the conduct of a supervisor with immediate authority over the victim, as in this case, then "an employer *is* vicariously liable for an actionable hostile work environment." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999) (emphasis added). In other words, an employer is strictly liable for the harassing conduct of its supervisors. However, there is an exception to this liability for the employer if the defendants show by a preponderance of the evidence "(a) that the employer exercised reasonable care to prevent

and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998). The defendants argue that the *Faragher* affirmative defense should preclude Sanford's claim.

The record reveals that the Manor adopted the SMC Handbook for use by its employees. The Handbook contains a disciplinary policy that prohibits "verbal or physical abuse of residents or other employees." Any violation of this policy, including offensive language, "will be cause of reprimand, suspension or dismissal." It further provides "[p]ersonal misconduct with a fellow employee on or off the job could jeopardize both employee's employment."

The Handbook provides a mechanism for reporting employment concerns, including sexual harassment. It states "If an employee feels aggrieved in any way concerning his employment, it is his responsibility to express the grievances in writing to his immediate supervisor." The employee is then required to request a meeting with higher levels of supervision if his "supervisor is part of the grievance."

Sanford was provided with a copy of the Handbook, and also attended several meetings in which policy issues contained in the Handbook were discussed. Sanford did refuse to attend a mandatory diversity training meeting which covered procedures for dealing with and reporting sexual harassment. However, between 2000 and 2003, Sanford did attend at least four staff meetings held by the Manor during which the Handbook's policy on unwelcome conduct was discussed. Certainly, the defendants have exercised reasonable care to prevent any harassing behavior.

Whether or not the defendants promptly corrected any harassing behavior is a closer question.

By Sanford's own account, the alleged sexual harassment occurred in March and April 2004. Although there is some disagreement over when Sanford first reported any alleged sexual harassment, Sanford admits that he first reported concerns over Carter's alleged sexual harassment to Peyton and members of the Manor's board only after all incidents of sexual harassment were over. At the August 2004 board meeting, the board undertook an investigation into the allegations, concluded that there were no witnesses to any of Sanford's allegations, but nevertheless expressed its zero tolerance for sexual harassment and made it clear that no conduct such as Sanford had alleged would be tolerated. Sanford does not allege any further incidents of sexual harassment after this board meeting. Thus, it appears that the defendant's actions were successful in curtailing any further instances of sexual harassment.

The second element of the *Faragher* defense requires a showing that Sanford unreasonably failed to take advantage of any preventative or corrective opportunities provided by the defendants or to avoid harm otherwise. There is no dispute that Sanford failed to complain in writing to the defendants concerning Carter's alleged sexual harassment, despite the written requirement in the Handbook. Additionally, Sanford did not complain of sexual harassment until after the alleged harassment had ceased. Certainly, the defendants should not be held vicariously liable for conduct of which they were not aware until *after* it occurred. Inasmuch as the defendants have satisfied both elements of the *Faragher* affirmative defense, Sanford cannot establish the fifth element of his hostile work environment sexual harassment claim. Thus, the defendants' motion for summary judgment on Sanford's hostile work environment sexual harassment claim will be granted.

**B. QUID PRO QUO SEXUAL HARASSMENT**

Sanford's claim for *quid pro quo* sexual harassment is based on Carter's promise that she

would ensure Sanford's courtesy shift was covered if he would travel out of town with her. In other words, he would be allowed to miss his courtesy shift so long as he gave in to her sexual advances. However, when he did not report to work on August 14, after refusing her advances and reporting her sexual harassment to superiors, Sanford alleges that Carter recommended he be fired and took other adverse actions against him.

To succeed on this claim of *quid pro quo* sexual harassment, Sanford must establish: (1) that he is a member of a protected class; (2) that he was subjected to unwelcomed sexual advances or requests for sexual favors; (3) that the harassment was on the basis of his sex; (4) that his refusal to submit to the unwelcomed demands resulted in an adverse employment action; and (5) that liability may be imputed to the employer. *Bowman*, 220 F.3d at 461. The defendants have conceded the first three elements of this claim. However, for the reasons set forth below, Sanford cannot establish any adverse employment action.

"In order to establish an adverse employment action, [Sanford] must show a significant change in [his] employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, a significant change in benefits, or other factors unique to [his] particular situation." *Akers v. Alvey*, 338 F.3d 491, 497-98 (6th Cir. 2003). An adverse employment action has been defined as a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). Examples of factors to consider in determining whether an employment action was materially adverse include: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular

situation." *Crady v. Liberty National Bank and Trust Co.*, 993 F.2d 132,136 (7th Cir. 1993). In general, a change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* "Whether a particular reassignment is materially adverse depends on the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position considering all the circumstances." *Burlington Northern and Santa Fe Railway Co. v. White*, 126 S.Ct. 2405, 2417 (2006). The fact that Sanford may disagree with the defendants' actions is irrelevant. Rather, he must show that "a reasonable employee would have found the challenged action materially adverse." *Id.* at 2415. The Supreme Court has chosen this objective standard in order "to separate significant from trivial harms" and because it is "judicially administrable," since it does not require courts to determine a plaintiff's subjective feelings. *Id.*

Sanford alleges that the following alleged actions of the defendants amount to an adverse employment action as a result of his refusal to submit to Carter's sexual advances. First, Sanford alleges that Carter "wrote him up" after he complained to Elder Cornelius and Elder Ward of Carter's sexual advances. In August 2004, Carter documented four specific incidents of insubordination and poor job performance by Sanford which had occurred since March 2004. Then, on November 12, 2004, Carter drafted a memorandum to Sanford detailing five incidents of insubordination. However, the record reveals that Carter wrote Sanford up numerous times before the alleged sexual harassment began in March 2004. Moreover, the record also shows that a HUD inspection of the Manor in the fall of 2003 revealed numerous maintenance deficiencies requiring immediate attention no later than November 3, 2003, and a follow up letter from HUD in January 2004 evidencing partial, untimely completion of the noted maintenance deficiencies. Certainly, the

quality of Sanford's job performance was an issue before March 2004. Moreover, Carter's write ups of Sanford simply do not amount to a significant change of job status sufficient to constitute an adverse employment action.

Second, Sanford contends that Carter had a duty to complete Sanford's performance evaluation prior to August 1, 2004. Not only was it not completed until August 9, 2004 or discussed with Sanford until August 16, 2004, but the score he received - a 66 - did not entitle him to the full 5.5% pay raise. Although the performance evaluation did recommend a pay raise, Sanford contends that he received no raise during the first pay period of August 2004. However, the record reveals that at the August 16, 2004 meeting of the Manor's board, the board promptly ordered that Sanford receive a positive job evaluation and a full raise, retroactive to August 1, 2004, as a result of Sanford's airing of his claims of sexual harassment. Sanford cannot complain of any adverse employment action with respect to his job evaluation or pay raise.

Third, Sanford contends that Peyton and Carter recommended to the Manor board in August 2004 that he be placed on probation or be terminated. Clearly, the Manor's board did not act upon these recommendations at this time; thus, no adverse employment action was taken.

Fourth, Sanford alleges that in October 2004, the police came to the Manor to investigate a resident's accusation that medication had been stolen from her apartment. Sanford contends that the police officer informed him that Peyton and Carter had accused him of stealing the pills. The Court finds that this alleged statement by Peyton and Carter to the police officer does not constitute a materially adverse employment action inasmuch as it did not result in any significant change in his job status.

Fifth, Sanford asserts that the removal of his pager in August 2004 constitutes an adverse

employment action. The Court, however, disagrees. Removal of his pager does not rise to the level of a significant change in employment status, but rather is an inconvenience and not evidence of retaliation.

Sixth, Sanford argues that the fact he was only given two weeks to move out of his apartment during the Christmas holidays was an adverse employment action. The Court again disagrees. Two weeks, instead of the four requested by Sanford, simply does not amount to a significant change in job benefits under the circumstances.

Finally, Sanford argues that Peyton told him that his unemployment would not be contested. However, upon applying for unemployment benefits on June 28, 2005, approximately fourteen weeks after leaving his employment at the Manor, the Manor apparently challenged his application. Sanford has not cited any authority which would allow this Court to impose Title VII liability upon the Manor for this post-employment action. Accordingly, the Manor's decision to challenge Sanford's unemployment application is not an adverse employment action sufficient to confer Title VII liability upon the Manor.

For the reasons set forth above, the alleged actions of the defendants do not satisfy the fourth element of the *quid pro quo* sexual harassment analysis. Moreover, as explained above, the defendants cannot be held vicariously liable for the actions of Carter based on the *Faragher* affirmative defense. Thus, the defendants' motion for summary judgment on Sanford's claim for *quid pro quo* sexual harassment will be granted.

**C. RETALIATION**

Title VII of the Civil Rights Act of 1964 protects employees from discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C.

§ 2000e-2(a). The anti-retaliation provision of the Act further forbids an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. *Id.* at § 2000e-3(a). Sanford complains that based on his complaints of sexual harassment, the defendants retaliated against him.

When presented with a retaliation claim, courts apply the *McDonnell Douglas/Burdine* framework of shifting burdens and proof. *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). To establish a prima facie case of retaliation, a plaintiff must establish that: (1) he or she engaged in activity protected by Title VII; (2) the defendant knew of the plaintiff's exercise of protected rights; (3) as a result, the defendant took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

Sanford's oral complaints to Peyton, Elder Cornelius, and Elder Ward constitute a protected activity under Title VII, and satisfy the first two elements of the retaliation analysis. Thus, the Court turns to the third element of the analysis - whether Sanford suffered an adverse employment action.

Sanford points to several alleged actions of the defendants as evidence of retaliation. Carter's write-ups, the August 2004 job evaluation, the recommendation to the board that he be terminated or placed on probation, the allegation that Sanford had stolen pills from a resident, the removal of his pager, the timing of his move out of the manager's apartment, the elimination of his position in courtesy at the Manor, and reneging on a promise not to contest his application for unemployment benefits. With the exception of the elimination of his position in courtesy at the Manor, the Court has already held that these alleged actions by the defendants do not constitute adverse employment

actions under Title VII.

In the past, one Manor apartment was occupied by the property manager. When Sanford's stepfather, Bolton, was property manager, he did not occupy the property manager's apartment because he owned his own residence, and Sanford was allowed to move into the vacant apartment. When Carter was hired in 2004, she also declined to reside in the Manor apartment. The new property manager hired to replace Carter, however, intended to reside in the Manor apartment, necessitating Sanford's move. Sanford contends that he lost his position in courtesy when he was asked to vacate the Manor apartment and that his loss of this position amounts to an adverse employment action.

While the Court agrees that the loss of his position in courtesy, under these circumstances, amounts to an adverse employment action, Sanford cannot establish that there was any causal link between the protected activity and the alleged adverse employment action. To satisfy this element, Sanford must proffer evidence "sufficient to raise the inference that the . . . protected activity was the likely reason for the adverse action." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). Temporal proximity between the protected activity and the alleged discriminatory act is alone not sufficient to establish causation. *Randolph*, 453 F.3d at 737. Thus, Sanford must put forth sufficient evidence to create an inference that his job was reassigned *because* he filed made oral complaints of sexual harassment, otherwise his duties would have remained the same.

Sanford has presented no direct evidence of retaliation. Although the elimination of Sanford's position in courtesy occurred within six months of his sexual harassment complaints, this temporal proximity alone will not sustain his claim. Other than his bare allegations and temporal proximity, there is simply no evidence which suggests that the likely reason for Sanford's loss of his

position in courtesy was his complaints against Carter. Without any evidence of a causal connection, Sanford cannot establish a prima facie case of retaliation.

However, even assuming that Sanford was able to establish a prima facie case of retaliation, Sanford's claim must fail. Under the *McDonnell Douglas/Burdine* burden-shifting framework, should the plaintiff succeed in making out the elements of a prima facie case, then "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Morris*, 201 F.3d at 792-93 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Once the employer satisfies this burden of production, then the burden shifts back to the plaintiff to demonstrate "that the proffered reason was not the true reason for the employment decision." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Throughout the process, however, the plaintiff bears the ultimate burden of persuasion. *Morris*, 201 F.3d at 793.

Here, the evidence reveals that the defendants' decision to eliminate Sanford's position in courtesy was based on the fact that this responsibility would lie with the new property manager who intended to live in the Manor apartment. Sanford has acknowledged that his work in courtesy was tied to the fact that he was living in the apartment at the time. Having proffered a legitimate non-retaliatory reason, the burden of production shifts back to Sanford to prove by a preponderance of the evidence that the legitimate reason offered was a mere pretext for retaliation. *Burdine*, 450 U.S. at 256; *Manzer v. Diamond Shamrock Chem Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994). Sanford has come forward with no evidence that the reason offered by the defendants was somehow a pretext for retaliation. Therefore, absent evidence that the defendant's explanation for the job elimination is merely pretext, Sanford's claim cannot be sustained. As a result, the defendants' motion for

summary judgment on Sanford's retaliation claim will be granted.

## IV. CONCLUSION

For the reasons set forth above, the Court, being fully and sufficiently advised, HEREBY ORDERS as follows:

(1) the defendants' motion for summary judgment [DE #27] is GRANTED;

(2) the defendants' motion for reconsideration [DE # 37] is DENIED AS MOOT;

(2) judgment in favor of the defendants will be entered contemporaneously herewith;

(3) the pretrial conference, currently set for July 19, 2007, and the trial of this matter, currently set for August 21, 2007, are hereby SET ASIDE;

(4) this matter is STRICKEN from the active docket of the Court; and

(5) this is a final and appealable order and no just cause for delay exists.

This the 19th day of June, 2007.

**Signed By:**

***Karl S. Forester*** KSF

**United States Senior Judge**